Filed 8/11/16  P. v. Hardin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY THOMAS HARDIN, JR.,<br><br>Defendant and Appellant. | F068705<br><br>(Super. Ct. No. BF133303A)<br><br>**ORDER DENYING PETITION FOR REHEARING; MODIFICATION OF OPINION [NO CHANGE IN JUDGMENT]** |

Respondent, The People of the State of California, filed a petition for rehearing on July 28, 2016.  We deny the petition for rehearing.

The unpublished opinion filed herein on July 15, 2016, is modified in the following particulars.  (The page numbers referenced in this order are based on the pagination in the slip copy of the original opinion filed in the clerks' office, a copy of which is attached to this order for reference.)

1.      Page 3:  Delete the second sentence of the first paragraph under the heading entitled "*Guilt phase*."

2.      Page 20:  Delete second sentence of the first paragraph under the heading "*Prosecutorial error in the guilt phase*."

3.      Page 35:  Delete the fourth sentence in the second paragraph under the heading "*Defense's closing and prosecutor's rebuttal arguments*" beginning with "Defense counsel then stated .…"

4.     Page 42: Modify the first sentence of the first paragraph under the heading entitled, "Analysis," to read as follows: "Here, the defense adopted the theory of diminished actuality to argue that Hardin was not guilty of first-degree murder."

5.     Page 47: Before the first full paragraph, currently beginning with "Since it is reasonably probable the outcome of the proceeding would have been more favorable," add a new paragraph as follows:

The error was prejudicial with respect to second-degree murder as well. There is a reasonable probability that, absent the prosecutor's mischaracterization of the diminished-actuality defense, the jury would have found Hardin acted without malice. Defense counsel's failure to argue the point does not preclude this probability.

6.     Page 47: Add footnote No. 20, at the end of the new paragraph stated in No. 5, above, as follows:

[20]The People request rehearing in this matter arguing that the prosecutor's error did not impact the second-degree murder finding necessarily included in the jury's determination that Hardin was guilty of first-degree murder. We reject this argument. The diminished-actuality defense encompasses all the mental states applicable to first- and second-degree murder, and the prosecutor's mischaracterization of this defense affected the jury's consideration of all the mental states incorporated in its verdict.

The People contend the defense impliedly conceded Hardin was guilty of second-degree murder at trial, therefore, the prosecutor's error was harmless as to a jury finding of second-degree murder. However, our consideration of the prejudicial effect of the prosecutor's error is not limited in the way the People contend. Here, the jury was instructed pursuant to CALCRIM No. 3428 that it could consider evidence of "mental disease, defect or disorder" for the "purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime." The jury was further instructed under CALCRIM No. 3428, that "[t]he People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically express malice aforethought and premeditation and deliberation for first degree murder or malice aforethought, either express or implied, for the lesser crime of second degree murder. If the People

2.

have not met this burden, you must find the defendant not guilty of the charged crime or the lesser included offense based on your finding." We cannot say that the prosecutor's improper characterization of the scope of CALCRIM No. 3428 was harmless in terms of the jury's consideration of the elements of second-degree murder that were necessarily included in its verdict.

7.        Renumber all subsequent footnotes after the newly inserted footnote No. 20.

Except for the modifications set forth in this order, the opinion previously filed remains unchanged.

Smith, J.

WE CONCUR:

Gomes, Acting P.J.

Peña, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JEFFREY THOMAS HARDIN, JR.,<br><br>　　　Defendant and Appellant. | F068705<br><br>(Super. Ct. No. BF133303A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jennevee H. de Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In the guilt phase of a bifurcated trial, Jeffrey Thomas Hardin, Jr., was found guilty of the first-degree murder of Michael Kabonic.  In the subsequent insanity phase, the jury rejected the contention that Hardin was not guilty by reason of insanity.

Hardin raises three issues relating to the guilt phase, and three issues relating to the insanity phase, of his trial.  As to the guilt phase, Hardin raises claims of prosecutorial

misconduct and argues that the evidence was insufficient to sustain a finding of first-degree murder. Regarding the insanity phase, Hardin contends (1) the trial court erred in rejecting a defense request to reopen its case after initial closing arguments in order for Hardin to testify; (2) the trial court's special instruction defining one of the prongs of the test for legal insanity constituted prejudicial error; and (3) the prosecutor committed misconduct by incorrectly defining another prong of the same test.

As to one of his claims of prosecutorial misconduct in the guilt phase, Hardin argues the prosecution misstated the law on diminished actuality, which was the heart of his defense. We agree with Hardin that the prosecutor erred in his representation of the diminished-actuality defense and that the error was prejudicial. Accordingly, we reverse Hardin's conviction and remand the matter for a new trial. Finally, we note the evidence in the record was sufficient to support a first-degree murder conviction; in light of our resolution of Hardin's claim of prosecutorial misconduct in relation to his diminished-actuality defense, we need not address the other issues he has raised in this appeal.

### FACTS AND PROCEDURAL HISTORY

An information filed on February 4, 2013, charged Hardin with committing the first-degree murder of Michael Kabonic on August 4, 2010.[1] (Pen. Code,[2] § 187, subd. (a).) The information further alleged that Hardin personally used a knife to commit

---

[1]The initial complaint in the case was filed in August 2010. Thereafter, on November 1, 2010, criminal proceedings were suspended to determine whether Hardin was competent to stand trial. Dr. Thomas Middleton was appointed to evaluate Hardin's competency. On December 21, 2010, the court found Hardin incompetent to stand trial and committed him to Patton State Hospital. The court found that Hardin was restored to competence on August 25, 2011. However, on October 6, 2011, the court once again found that Hardin was incompetent. On November 3, 2011, the court appointed Dr. Sincoff to evaluate Hardin. Hardin was again committed to Patton State Hospital for treatment and the restoration of competency. On January 8, 2013, the court found Hardin to be competent, and criminal proceedings were reinstated.

[2]Subsequent statutory references are to the Penal Code unless otherwise specified.

the murder. (§ 12022, subd. (b)(1).) Hardin entered pleas of not guilty and not guilty by reason of insanity to the count alleged in the information; he further denied the allegation that he personally used a knife in the commission of the offense.

The guilt phase of the trial began on November 6, 2013. The jury found Hardin guilty of first-degree murder on November 14, 2013. The insanity phase commenced on November 18, 2013. On November 21, 2013, the jury found that Hardin was not insane at the time of the killing. The trial court sentenced Hardin to 25 years to life plus one year in prison.

*Guilt phase*

There was no dispute at trial that Hardin had killed Michael Kabonic with a knife. Rather, the question for the jury was whether Hardin was guilty of murder in the first or second degree. The prosecution argued that the jury should find Hardin guilty of first-degree murder because Hardin acted with express malice aforethought and with deliberation and premeditation. The defense presented a diminished-actuality defense based on section 28, which is entitled "[e]vidence of mental disease, mental defect, or mental disorder,"[3] arguing that Hardin suffers from paranoid schizophrenia and, as a result of its symptoms, did not actually deliberate and premeditate in killing Kabonic as required for first-degree murder.

The prosecution called two percipient witnesses who had personal knowledge of the circumstances of the murder: Tamara Humes, Hardin's aunt (the sister of Hardin's mother) and Douglas Jones (a friend of Humes's). Humes testified that, in August 2010,

---

[3]Section 28, states, in pertinent part, as follows: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

she lived in the Oildale area of Bakersfield with Kabonic, who had been her friend for 20 years. Hardin and Kabonic knew each other through Humes; there was no hostility between them.

At the time of the murder on August 4, 2010, Hardin had been staying with Humes for three days, while he waited for a bed at Teen Challenge, an alcohol and drug rehabilitation center. Hardin was headed to Teen Challenge for treatment of his methamphetamine addiction. Hardin, who was 25 years old in 2010, had started using methamphetamine sometime after high school.[4] Humes did not see Hardin use drugs during the time he stayed with her that August and did not believe he used drugs during that period.

On August 4, Humes, Jones, and Hardin spent the day together. Hardin had not been "acting right that day." He would "burst out in laugh[ter], start laughing like somebody was there and there was no nobody there. He was just acting bizarre, just really strange." Humes did not question Hardin's behavior because he acted oddly on virtually a daily basis, often referencing a "network" that was "watching him." Hardin had been talking about the network since he was 17 years old.

At approximately 5:30 p.m. on August 4, 2010, Humes started preparing a dinner of tacos at her house for herself, Jones, and Hardin. Her housemate, Kabonic, came home at 6:15 or 6:30 p.m.; he was tired from working in the oil fields all day and went to bed shortly thereafter. Humes, Jones, and Hardin sat down to dinner. Hardin stood up from the table and poured salsa on his tacos "from way up high," making a mess. Humes was upset and sent Hardin to his room, which was next to Kabonic's room, to finish his dinner. Hardin "just grabbed his plate and went to his room, walked down the hallway" without a word.

---

[4]Hardin was born in 1985.

4.

About two or three minutes after Hardin left the table, Humes and Jones heard Kabonic suddenly yell, "you're fucking stabbing me." Humes ran into Kabonic's bedroom and found Hardin sitting on top of Kabonic's stomach. Noticing that Kabonic was lying in blood, as well as blood stains on the walls of the room, Humes said, "no, Jeffrey, no." Hardin "just turned around and looked at [her], and that was it. He was not there." Humes was panicked and scared; she called for Jones and ran downstairs to call 911. In the hallway outside Kabonic's room, she passed Jones, who was going into the room.

Jones testified that, as he stood in the doorway of Kabonic's room, he saw Hardin, who was sitting on Kabonic's torso, "pulling [a] knife out of [Kabonic's] neck" with both hands. The knife "[l]ooked like a carving knife." Jones continued, "[Hardin] looked up at me and he gave me an evil look, and then he started crawling off of [Kabonic] like he was coming after me" so "I ran." Jones explained that he ran down the hallway in the direction of the living room and banged into a wall where the "hallway makes a little jog then goes into the living room like a little wall there. [¶] … [¶] … I turned around and I hit my head. Then I heard something else hit the wall, and he had thrown the knife at me. [¶] … [¶] … [The knife] hit the wall … [and fell] on the floor."

Humes was in the living room on the phone with the 911 dispatcher when Hardin walked past her with blood on his hands. He said something to the effect of, "Aunt Tammy, help me." Hardin then drove away in Humes's Dodge Ram pickup truck. Kabonic was pronounced dead by emergency medical personnel at the scene. The coroner testified that the cause of death was multiple stab wounds to the front of his body.

Humes's pickup was found by law enforcement crashed into a guardrail at an intersection in Rosedale in the early morning hours of August 5, 2010. A canine unit located Hardin shortly thereafter in the front yard of a nearby residence; Hardin told the

5.

officer, "I'm here," when the dog approached the area.  Hardin was arrested and taken to the Kern County Sheriff's Department for questioning.

### *Hardin's police interrogation*

Hardin was questioned by Sergeants Damon McMinn and Avery Simpson of the Kern County Sheriff's Department on August 5, 2010.[5]  The video of the entire interrogation was played for the jury.

Hardin told the officers he had thought of hurting people for years because he had long been mentally tormented by a "network" of people but no one in his family, among his mental health providers, or in law enforcement had ever taken the issue of the network seriously, despite the deep anguish and anxiety it caused him.  As to what the network did, Hardin explained that it was "going to kill my family … and now … this network is just playing like people are suffering … [and] people don't need to suffer …."  He also said, "People are like suffering in this network and I don't know [if] it's just a joke or not but it's driving me—it's driving me batty because it's playing like it's my family.  And [they are] using my famil[y]'s voices and it might sound crazy but [they are] acting like [they are] suffering and it's fucking driving me insane."  He said he "hurt" Kabonic "because of this suffering thing that they keep playing."

Regarding the day of the murder, Hardin said he took his dinner to his room but "[did not] know if [he] took a bite of it or not …."  He took a knife from his bag (he had taken the knife from his stepmother's house about two weeks earlier) and "attacked [Kabonic]."  Hardin explained that Kabonic "was in bed he was just laying down on his back," and "I walked up there[,] I stabbed him and … I just hurt him.  [¶] … [¶]  I did."  He did not have a quarrel with Kabonic and had not planned to kill him:  "I did not plan it … or two weeks ago … like I said it's been … years coming on … it's been years."

---

[5]In August 2010, when Kabonic was murdered, Sergeant McMinn was a detective in the Homicide Unit of the Kern County Sheriff's Office.

Hardin acknowledged Kabonic just happened to be in the wrong place at the wrong time. Hardin said he should have hurt someone a long time ago because the network had driven him crazy for so long.

Hardin admitted he knew the stabbing would kill Kabonic and he knew it was wrong. At the same time, Hardin did not think Kabonic would want to live with the injuries Hardin had inflicted. Hardin also understood he would get into trouble and go to jail for doing what he did and consequently he left the scene in his aunt's truck. Specifically he stated: "I broke the law … I hurt somebody … and then I took a truck and then I left it and it's a lot." Hardin explained that, after he fled in the truck, he wanted to turn himself in or get arrested, and so he intentionally crashed the truck, albeit at a low rate of speed so he could jump out of it without injury before it crashed.

Hardin stated in the interrogation that he had last used methamphetamine about 10 days before the murder. Sergeant McMinn also testified that Hardin did not appear to be under the influence of methamphetamine at the time of the interview.

### Dr. Michael Musacco

Michael Musacco, Ph.D., a psychologist, was retained and testified as an expert for the defense. He evaluated Hardin in September 2010 to assess his competency to stand trial and the applicability of a plea of not guilty by reason of insanity. Musacco evaluated Hardin again in July 2013 to assess whether he was insane at the time of the murder.

Musacco diagnosed Hardin with severe paranoid schizophrenia, a chronic mental illness. Regarding the degree of severity of Hardin's schizophrenia, Musacco noted as follows:

> "There's people that I've … treated and people that I've worked with that have schizophrenia that have jobs and families. Their illness is fairly well controlled. [¶] Occasionally in a point of stress they might hear voices or things like that. They go back to the doctor, have the medications tweaked, doing better. That would be a mild form of schizophrenia. [¶]

7.

Severe schizophrenia would be the person even with medications and psychosocial support that are still real mixed up about reality. They're still hearing voices, still delusional. [¶] The extent of Mr. Hardin's mental illness, the severity, the details of his symptoms seem to be more on a severe end of things. It's not a black and white thing. [¶] Mental illness[es] wax and wane over the course of time, but we have a fairly long history. He's still a young man relatively—fairly long history of symptoms that have really affected the course of his life."

Musacco testified that, in evaluating Hardin, he noted "[v]ery prominent delusional beliefs; inescapable, severe delusional beliefs that really affected the course of [the] interview with him." He further expounded on the nature of Hardin's delusional beliefs as follows:

"Mr. Hardin believed and believes that there is—that he is the—he is the target of a network of individuals .… [¶] … [¶] … He shared with me that there was a network of persons, including drug dealers, the FBI, the police, perhaps family, that had done a variety of things to him, including targeted him. They placed a microchip in his brain that traveled around his body that kept track of him, that controlled him. [¶] He felt that he was being targeted for mental and emotional torture. There was nothing that he could do to escape it. [¶] At some point he felt that this network of people were targeting his family, they were going to harm his family. On other occasions he thought his family may have been part of this network of people. [¶] And this isn't the kind of thing [where] I wonder if this is going on. This is I'm convinced this is going on, and, you know, very distressed by it. Felt the whole sum total of it was that he was being mentally and emotionally tortured and it was all orchestrated by this network of people."

Musacco also diagnosed Hardin with a polysubstance disorder in light of Hardin's dependence on alcohol and methamphetamine. Musacco opined that the use of these substances exacerbated Hardin's schizophrenia. Musacco testified that paranoid schizophrenia can impair the ability to premeditate and deliberate because it profoundly alters an affected person's perception of reality and results in a disorganized and confused thought process. He further testified that, "[a]t the same time[,] a person with schizophrenia can make decisions that are based on reality and act on them without being influenced by their mental illness."

8.

On cross-examination, Musacco testified that "mental illness and substance abuse commonly … co-exist …." He confirmed that it can be difficult to confirm mental health diagnoses in such a situation because of overlapping symptomology. He agreed that the symptoms of schizophrenia were analogous to the symptoms of methamphetamine-induced psychosis, which included "auditory hallucinations, delusional beliefs, [and] impaired reality contact."

The prosecutor also discussed Hardin's medical records with Musacco, specifically a 2004 report by a Dr. Prather. Musacco agreed the report noted that (1) Hardin started using methamphetamine at the age of 17; (2) the 2004 visit with Dr. Prather, when Hardin was 19, represented the first time Hardin had seen a mental health professional; and (3) Dr. Prather concluded he could not make a firm mental health diagnosis because Hardin had only been "clean," in terms of his methamphetamine use, for less than a month.

Musacco further acknowledged that in all the years since Hardin's initial visit with Dr. Prather, Hardin's methamphetamine-use disorder, which was also severe, had not been ruled out as the potential cause of his mental health problems, since doing so would require Hardin to stay off the drug for a reasonable length of time. Indeed, Hardin reported to Musacco that he had been "meth free" for only about a week prior to the murder. Before that time, Hardin was using, intravenously, a "dime" or $10 worth of the drug daily. Based on his review of Hardin's medical history, Musacco nonetheless concluded that "the vast majority of people have said [Hardin's] got schizophrenia and a drug use disorder."

Finally, Musacco stated that "[l]ots of people with a severe mental disorder commit crimes that may not be related to their mental illness whatsoever. [¶] … [¶] [These people] are criminally organized and oriented. So I may be mentally ill, but if I go into the 7-11 and steal a six pack of beer because I don't have money and I want beer, my mental illness, that's not—if I go in and tell the clerk that he's an alien from another

9.

country and I try to beat him up—different scenario there.  [¶]  So most of the time, even people with mental illnesses, their crimes are committed out of criminality rather than mental illness."

***Insanity phase***

The insanity phase opened with the defense calling Hardin's mother, Lisa Hardin, who was the only fact witness in this phase of the trial.  Lisa Hardin testified that Hardin was raised in the Rosedale area of Bakersfield.  Hardin did "very well" in high school and graduated, but had developed mental health problems in his senior year.  Shortly after high school, he slit both his wrists in a suicide attempt late at night, leading to a dual diagnosis of "schizophrenic bipolar."  Thereafter, Hardin managed to start at Bakersfield College and initially did well there, but he was on numerous medications and "it was really hard to get him adjusted to those."  He began to exhibit eccentric behavior, breaking mirrors in the house because he thought networks of people were behind them and shutting off the electricity because he heard voices through the electrical outlets.  Hardin also became very resentful toward his mother because he believed she had placed a microchip in his head to monitor him.

Hardin continually talked about a network of people who were after him.  He became "just real fearful for his life [and his family's] lives" because the network told him it was going to kill them all.  Over a 10-year period, Lisa Hardin repeatedly heard Hardin pleading with the network, having conversations when no one was there.  She would hear "[a lot] of cursing, crying, pleading, requesting them to please stop, to leave his family alone, that he wasn't nobody important.  He didn't know why they were out to get him or to get us."  Hardin called the police hundreds of times in this regard, "so many times it's unbelievable."  He also cut his wrists another three times.  Hardin self-medicated with methamphetamine and described bugs flying out of his head; his mental illness "got more intense" with the drug abuse.  In 2008, he damaged his mother's house and, consequently, was placed on felony probation and sent to a residential drug-

10.

treatment facility.  However, for about a year prior to the murder, he was living in his own apartment, taking his medication, and going to school.

### Defense's expert witnesses

#### Dr. Thomas Middleton

Thomas Middleton, Ph.D., a psychologist, testified for the defense.  Middleton did not evaluate Hardin's sanity at the time of the murder but, rather, on three separate occasions evaluated Hardin's competency to stand trial:  November 2010 (appointed by the court); August 2011 (retained by the defense); and December 2012 (retained by the defense).  On all three occasions, Middleton diagnosed Hardin with paranoid schizophrenia; he testified that Hardin's schizophrenia was severe.  In the 2012 evaluation, Middleton also diagnosed Hardin with amphetamine dependence and polysubstance dependence in institutional remission, but his primary diagnosis was paranoid schizophrenia.  He explained the symptomology of schizophrenia as follows:

> "Typically it involves … a deterioration.  So there has to be a baseline and then a drop off [in the teens or early 20's], and then the individual can manifest a variety of psychotic symptoms such as hallucinations, visual abnormalities, auditory abnormalities, tactile abnormalities as well as delusional beliefs, so distorted thoughts regarding demons or planets or aliens or chips or whatever it happens to be.  [¶]  They may take the form of very bizarre symptoms such as chips or aliens or networks or they may just be a constellation of pervasive and severe lesser hallucinations and delusions."

Middleton also noted that, during his initial evaluation, Hardin reflected "delusional beliefs that there was a chip in his head, that there was a network that was monitoring his functioning, and he reported a variety of psychotic symptoms."  Similarly, during his August 2011 evaluation, Hardin "continued to be quite bizarre, delusional" and when asked open-ended questions, "his responses became increasingly bizarre and rambling."  Finally, Middleton noted, with regard to Dr. Prather's 2004 report, that "Dr. Prather was of the opinion that Mr. Hardin had a history of substance abuse, but the underlying

condition was a severe mental illness such as schizophrenia." He also pointed out Dr. Prather's report noted that Hardin's father had schizophrenia.

Middleton testified that Hardin told him he "had used IV drugs, that he abused alcohol and marijuana, and he had been doing so since he was 17 years old." Middleton further stated that long-term methamphetamine use can cause psychotic symptoms, including hallucinations and hearing voices; similarly, methamphetamine withdrawal can lead to delusions, hallucinations, and paranoia. Middleton concluded he did not attribute Hardin's mental health issues solely to drug abuse:

> "In my opinion it shows a clear pattern of psychosis.… [I]t's taken two stays at Patton State Hospital, multiple psychotropic medications, two and a half to three years treatment in order to have him stabilized. [¶] He continues to have the underlying delusional belie[fs] about the chip and the network and so forth, but he's able to tone it down on his current medications. [¶] The DSM-IV-TR, the diagnostic manual, indicates that a substance[-]induced psychosis typically lasts for a much shorter period of time. The fact that it's taken three years for Mr. Hardin to stabilize in my opinion strongly supports that he has an underlying schizophrenia disorder and that this was clear evidence in 2004 when the psychiatrist evaluated him there when he had fairly brief exposure to substance abuse but he was experiencing bizarre delusions. [¶] It's my experience that individuals abusing methamphetamine may have auditory hallucinations or paranoia in a general sense. They do not have specific voices. They do not have fixed delusional beliefs such as the network or a chip."

### Dr. Ross Kremsdorf

Ross Kremsdorf, Ph.D., a clinical psychologist, was appointed by the trial court and evaluated Hardin in May 2013 to determine whether he met the criteria for entering a plea of not guilty by reason of insanity. Dr. Kremsdorf diagnosed Hardin with schizophrenia, paranoid type. Dr. Kremsdorf found significant Hardin's "periodic comments about his beliefs of the, quote, unquote, network and the perception that—of being fearful of this—kind of hard to get a clear picture of what it was, this vague group that was fearful to him and scary and was threatening to harm him and his family, and that persisted. [¶] And I saw some of that in the records before, but when I read some

12.

other records later that was always there, and in the police reports for that matter." Dr. Kremsdorf found Hardin's consistent references to the network significant because "[p]ersistent delusions is one of the major symptoms" of schizophrenia. Dr. Kremsdorf found it noteworthy that, although Hardin seemed less agitated when discussing the network with Dr. Kremsdorf than reflected in prior records, he still maintained a belief in the existence of the network.

Applying the California definition of legal insanity, Dr. Kremsdorf opined that Hardin was legally insane at the time he murdered Kabonic. He explained the basis of his opinion as follows:

> "[I]n my experience the gestalt, the whole situation, was compelling to me because it wasn't a case where he did something that was for gain, let's say a robbery or something. He wasn't—and there was no apparent—all the— some of the witness statements that were made at the time in the police investigation, there was no apparent problem between him and the victim. There was no anger or major upset. [¶] It was just sudden and out of the blue and just got up from the table and went in there and did this terrible thing, but it seemed to have no logic to it at all, and he immediately afterwards mentioned the comments about his delusions, that this person was somehow connected with the network and he had—he just did that action. [¶] So those were the things that really stood out, his long term delusion that suddenly just made him act, which strongly implied to me that he didn't understand the nature or quality of his actions at the time and he didn't necessarily think it was wrong because he had to defend himself."

As to whether a mental disease or defect was the cause of Hardin's insanity, Kremsdorf stated that Hardin's psychiatric records also indicated that Hardin had a "severe and ongoing mental illness." Kremsdorf specifically referenced Dr. Prather's 2004 report, noting: "There was some discussion about if substance abuse was the cause or not and the historical beginnings or causation of these things, but I think that in one of the reports, one of the earliest reports, that person was also struggling with trying to sort those two things out but felt that there probably was an underlying mental illness. This was the report by Dr. Prather."

13.

Dr. Kremsdorf also noted that, although Hardin's statements to the police appear to indicate that Hardin knew he was stabbing Kabonic and that it was wrong to do so, it was possible that at the moment Hardin committed the murder he did not know what he was doing and/or that it was wrong but, immediately afterward, realized he had hurt or killed Kabonic by stabbing him and had done something that was clearly wrong. In other words, Hardin's statements to the police may not reflect what Hardin actually knew or understood at the moment he committed the murder.[6] Thus, "[i]t could be that he—immediately after he did his action he could observe it, you know, that—what he just did without actually being aware [at the time of the action]." Similarly, "at the moment of the action," Hardin may have thought "he was defending something, himself, not sure who [from the network] and that means that at that moment he might have felt that it was not wrong .…"[7] Indeed, Kremsdorf concluded, "it didn't make any sense any other way .…" On the other hand, Kremsdorf acknowledged, under cross-examination, that there was no evidence Hardin thought he was doing something other than stabbing Kabonic at the time he committed the murder, so it would be "highly speculative" to suggest Hardin was thinking something other than what was reflected in his statements to the police. Kremsdorf also testified that he understood the knowing-the-nature-and-quality-of-the-act prong of the insanity definition to include a motive component.

Finally, Kremsdorf testified that simply suffering from schizophrenia or a mental illness by itself did not render a person legally insane; the person in question would still have to satisfy the criteria of the applicable legal standard for insanity.

---

[6]Kremsdorf observed that, during the police questioning, Hardin "sometimes … sound[ed] rational, other times he didn't," which was not unusual for the mentally ill.

[7]Kremsdorf noted that Hardin claimed in his police statement that the network had something do with why Hardin attacked Kabonic. He also noted that Hardin told the police "he just felt he had to defend himself in effect."

14.

### *Dr. Michael Musacco*

Dr. Musacco first evaluated Hardin in September 2010 to assess his competency to stand trial and the applicability of a plea of not guilty by reason of insanity. He also reviewed a range of prior psychiatric and psychological records and police reports and spoke to Hardin's mother. Regarding his assessment, Musacco testified as follows:

> "[Hardin's] mental functioning at that time was exceedingly impaired. He—his sense of what was real and what wasn't real was very—well, he had very poor reality contact. [¶] He believed that there … were people in the drug world and people in the FBI and other organizations that were setting out to torture him mentally or harm him or hurt his family members. [¶] He was hearing voices. His mood was very labile, meaning his—he could go from very sad and upset to happy, to normal. So his sense of reality was substantially and obviously impaired. [¶] His perceptions, hearing things that weren't there, was impaired. [¶] His insight, in other words his understanding that these are symptoms of a mental disorder that I'm suffering versus this is reality, that was completely impaired, because in his mind the reality did revolve around this network that had been essentially torturing him so, again, extreme disconnection with reality, a lack of appreciation for the fact that his mental illness was responsible for that. His thoughts and his mood was substantially influenced by those symptoms. [¶] … [¶] … [T]here was no evidence of malingering at that time."

Musacco concluded that on August 5, 2010, when Hardin killed Kabonic, he "met criteria for a finding that he was not guilty by reason of insanity." Musacco explained his reasoning as follows:

> "Well, [Hardin] suffers from a mental disease or defect that impaired his reality contact and his—his perceptions to a significant degree. His understanding of reality was completely at odds with the world as most people would see it. As a result of that he felt he was being tortured by this network, and he was at his wits end. He didn't know what to do. [¶] He, without any particular reason, chose this person who he had no problem with and seriously assaulted him resulting in that person's death, and the alternative hypothesis that this was a criminally motivated behavior or a product of intoxication. There is no evidence of alternative explanations, and instead all of the data we have puts together this picture that this person

15.

has a severe mental illness that caused him to be unable to appreciate the quality of his actions at the time that the offense occurred."

Musacco explained that the mental illness at issue was schizophrenia, paranoid type, and that Hardin was unable to appreciate the nature and quality of his actions because of that mental illness.

Musacco again evaluated Hardin in July 2013, after Hardin had spent a considerable period at Patton State Hospital. Musacco testified that he had additional records from the state hospital to review, which provided a more complete picture of Hardin's mental functioning over several months. He stated, "I did my usual interview and the malingering test and everything came out that malingering isn't an issue in this case." Although Hardin still had paranoid schizophrenia and continued to manifest his concern with the network, Musacco said that, "consistent with the records I reviewed there had been a substantial improvement. He wasn't so obsessed with these topics of the network or people being out to get him." The improvement "would be expected. [Hardin] had been restored to trial competency so you would expect that the symptoms would be less prominent or more controlled than they had been before or maybe even complete remission for that matter." After this second evaluation, Musacco again found that Hardin met the criteria for being legally insane when he killed Kabonic.

Regarding Hardin's statement to the police, Musacco testified as follows:

"[The police statement was] [s]ignificant insofar as it contained data that has been pretty well consistent throughout the records that Mr. Hardin's mental state was, and his emotional functioning was, significantly impaired. Again, this is not mild or moderate. This is severe. [¶] His sense of what is happening in the world was completely upside down, and when you look at what he said to the police and the investigating officers it provides pretty strong evidence which led all the doctors to kind of reach that same conclusion in terms of his ability to appreciate the quality of his actions. He was not—not all there or even close to it at the time of the offense."

On cross-examination, Musacco testified that he understood the quality-and-nature-of-the-act prong of the insanity test to incorporate a motive component, whereby

16.

the lack of a rational motive for the act (as in Hardin's case) would suggest that Hardin did not know the nature or the quality of his actions. Nonetheless, when the prosecutor asked whether Hardin knew "he was knifing a guy" and "physically doing an act that caused death," Musacco responded as follows: "I think based on what [Hardin] said at the time he was arrested … he knew that [his act] was wrong and he knew the person was seriously injured and maybe not alive." Musacco repeated that conclusion, stating: "I think that [Hardin] knew he was stabbing a human being, and I think that pretty quickly upon doing that he realized that the victim might die as a result of that." Indeed, Musacco acknowledged that Hardin would *not* "fit" the definition of insanity if knowing the nature and quality of the act as used in the definition meant whether Hardin knew he was knifing Kabonic to death at the time he was doing so. Similarly, regarding the knowing-that-the-actions-were-wrong prong of the insanity test, Musacco testified that Hardin's police statement revealed that Hardin knew the difference between right and wrong at the time he committed the murder: "[Hardin] clearly said that what he did was wrong immediately when it happened." Musacco further testified that the police interview was "key to this case" because the interview makes clear that "[Hardin] knew [his action] was wrong" and that "he was going to get into get in trouble" for it.

### *People's Expert Witness*

#### *Dr. Lauren Thomas*

Lauren Thomas, Ph.D., a clinical and forensic psychologist, testified as an expert witness for the People. Thomas was appointed by the court to evaluate Hardin to determine whether he was legally insane when he killed Kabonic. Thomas met with Hardin in April 2013 and determined he displayed no signs of being mentally ill or delusional. She testified that "[h]is thought process was clear and organized," "[t]here was no evidence of any kind of thought disturbance[,]" and "[h]e wasn't endorsing any psychiatric symptoms …."

17.

Thomas testified that Hardin's presentation and answers to her questions suggested he was not a candidate for a diagnosis of schizophrenia. Thomas diagnosed Hardin with "[s]ubstance-induced psychotic disorder that was resolved." She explained that, "now that time has passed, this disorder doesn't exist. Meaning there is no mental defect or mental disorder with the exception of methamphetamine abuse."

Thomas opined that Hardin did not meet the legal standard for insanity for the following reasons: "[I]t's my professional judgment that [Hardin] does not have a mental defect or mental disorder. His meth substance abuse is what was creating these symptoms that have now cleared up; so that's one thing. [¶] … [¶] … The second one is he understood right from wrong at the time of the offense." Thomas explained that "[Hardin] fled the scene after he committed the offense, which indicates he knew that there was something wrong with what he did, and that when the police picked him up about four and a half hours, I believe, after the offense, he indicated he broke the law, he hurt somebody, and took the truck. [¶] When he was asked if he knew what he did was wrong, he said, yes, he did know it was wrong and bad. When asked if he thought he was going to be arrested for it, he said, yes. So those things are relevant in terms of whether he knew right from wrong at the time of the offense." Finally, Thomas explained that "[Hardin] understood he was killing someone. He understood the nature of that. He stated he hoped [Kabonic] would die because he stabbed him in the eye and he didn't think he would want to live that way. That's understanding the nature of what you're doing."

Thomas admitted on cross-examination that she had reached a contrary conclusion in her written report of Hardin's evaluation. Specifically, in her written report, Thomas had opined that Hardin did not have the ability to appreciate and understand the quality of his actions at the time of the offense. However, her opinion changed when she "focused more on the fact that he didn't even have a mental defect or mental disorder, that it was

18.

the methamphetamine abuse that was a factor in the commission of the crime."[8]  She clarified that "I'm now saying that with further information I believe that he does meet that—does not meet the standard of under—he understands the nature and quality of his act.  [¶]  At that time I was stating because of the methamphetamine abuse and the fact that he was cognitively impaired with the network and everything that he didn't.  But I now, upon having further knowledge and specific examples, have changed my perspective, yes."[9]

### Other witnesses

The People called Jay Winn, an investigator for the Kern County District Attorney's Office, who had interviewed Lisa Hardin on October 6, 2010.  Lisa Hardin told Winn that Hardin's mental health issues began after he was involved in an ATV accident at the age of 17.  She also told him that Hardin began using methamphetamine around the same time.

The People also called Ana Ovando, an investigator for the Kern County Public Defender's Office, who had interviewed Lisa Hardin on August 20, 2013.  Lisa Hardin told Ovando that Hardin began to self-medicate with drugs shortly after being diagnosed with a mental illness, and, as a result, his mental illness was exacerbated.

The defense called Pam Singh, an attorney with the Kern County Public Defender's Office, as a rebuttal witness.  Ms. Singh had represented Hardin at the preliminary-hearing stage in two unrelated criminal matters.  Singh had concerns about

---

[8]Thomas appears to be drawing a distinction between organic mental disorders and drug-induced disorders for purposes of the insanity defense.  As discussed below, in the insanity phase, such a distinction is significant for reasons that do not apply in the guilt phase.  (See §§ 28, subds. (a) & (b), 29.8.)

[9]Thomas offered two examples of a person who did not understand the nature and quality of his actions:  (1) "[i]f someone cut a woman's throat thinking they were slicing into a loaf of bread" and (2) "[i]f someone cut off a man's head thinking it would be fun watching him wake up in the morning looking for his head …."

19.

Hardin's competency and mental health status, which she discussed with the district attorney on those cases. Based on her concerns, she sought plea deals for Hardin, one of which required him to obtain treatment at a "dual diagnosis" residential treatment facility.

### *DISCUSSION*

### I.    *Prosecutorial error in the guilt phase*

Hardin was charged with first-degree murder. Although he pleaded not guilty to the charge, he conceded he was guilty of the lesser-included offense of second-degree murder in the guilt phase of the trial. The defense strategy was to defeat the first-degree murder charge. The defense sought to accomplish this by relying on the diminished-actuality defense because Harden had long suffered from delusions, hallucinations, and other psychotic symptoms that led to a jumbled thought process and a distorted sense of reality. Hardin's specific theory of defense was that his delusions and other psychotic symptoms prevented him from actually deliberating and premeditating in committing Kabonic's murder.

Hardin now argues the prosecutor committed misconduct in his rebuttal to the defense's argument. More specifically, he contends the prosecutor mischaracterized the scope of the diminished-actuality defense as set forth in CALCRIM No. 3428 (which was given to the jury) by connecting Hardin's psychotic symptoms to his substance-abuse disorder rather than his paranoid schizophrenia, and insinuating, incorrectly, that drug-related mental disorders, unlike organic mental diseases, could not be the basis of this defense.

The People respond that the prosecutor did not draw an unwarranted distinction between drug-induced and organic mental disorders so as to eviscerate Hardin's diminished-actuality defense, but rather argued that evidence of both types of disorders was not probative of Hardin's mental state in contrast to more applicable evidence such as Hardin's statement to the police and his actions in committing the murder. The People further argue that, even if the prosecutor's argument was improper, the error was

20.

harmless in light of evidence demonstrating that Hardin had the requisite mental state for first-degree murder.

We agree with Hardin that the prosecutor's rebuttal was improper to the extent he questioned whether Hardin's psychotic symptoms were caused by schizophrenia or, rather, a substance-abuse disorder, because the implication of such an argument is that the distinction makes a difference for purposes of the diminished-actuality defense when the law states to the contrary. Under the law, the jury was free to consider the effect of Hardin's psychotic symptoms on his mental state regardless of whether the source of the symptoms was his diagnosed schizophrenia, his diagnosed substance-induced disorder, or both. By implying that drug-induced disorders were outside the purview of the diminished-actuality defense, the prosecutor mischaracterized the law. Moreover, since there is a reasonable probability the outcome of the proceeding would have been more favorable to Hardin absent the prosecutor's error, the error is prejudicial. Accordingly, we reverse Hardin's conviction and remand the matter for a new trial.

### A. *Diminished-actuality defense and relevant jury instructions*

The diminished-actuality defense is premised on section 28. Section 28 abolished the defense of diminished capacity, which addressed a defendant's "'general capacity or ability to form a specific intent or harbor a mental element of an offense.'" (*People v. Reyes* (1997) 52 Cal.App.4th 975, 982, quoting *People v. Visciotti* (1992) 2 Cal.4th 1, 56; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1253 ["'The essence of a showing of diminished capacity is a "showing that the defendant's mental capacity was reduced by *mental illness, mental defect or intoxication*"'"]; *People v. Saille* (1991) 54 Cal.3d 1103, 1111-1112; § 28, subd. (b); § 25, subd. (a); § 29.4, subd. (a).) As a result of the abolishment, evidence of mental disorder may no longer be used as an affirmative defense to a crime. (*Reyes*, *supra*, at p. 982.) However, pursuant to section 28, subdivision (a), evidence of a mental disorder is admissible to raise a doubt as to whether

a defendant actually formed a mental state that is an element of a charged offense.[10] (*Reyes, supra*, at p. 982; *People v. Coddington* (2000) 23 Cal.4th 529, 582-583, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046.)  In other words, section 28 permits a defendant to offer evidence of "diminished actuality," i.e., that "a mental disease, mental defect, or mental disorder," including a mental disorder caused by drug intoxication, could prevent actual formation of the requisite mental state.  (§ 28, subd. (a); see also *People v. Cortes* (2011) 192 Cal.App.4th 873, 908; *People v. Coddington*, *supra*, at pp. 582-583.)  An expert may testify regarding a defendant's mental condition(s) so long as the expert gives no opinion on the ultimate question of whether or not that defendant actually had the requisite mental state.[11]

Section 28, by its express terms, applies only to the guilt phase of a bifurcated trial.  (See § 28, subd. (c).)  In the insanity phase, evidence of a mental disorder caused by drug intoxication is subject to the limitation set forth in section 29.8,[12] which provides

[10]Section 28 provides as follows:  "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.  [¶]  (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.  [¶]  (c) This section shall not be applicable to an insanity hearing pursuant to Section 1026.  [¶]  (d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

[11]"In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states ….  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."  (§ 29.)

[12]Section 29.8 was previously numbered as section 25.5.

22.

that the insanity defense "shall not be found by the trier of fact *solely* on the basis of …

an addiction to, or abuse of, intoxicating substances." (§ 29.8, italics added; see also

*People v. Robinson* (1999) 72 Cal.App.4th 421, 427 [§ 29.8 "erects an absolute bar"

prohibiting use of voluntary ingestion of intoxicants—as well as brain damage and

mental disorders solely caused by such substance abuse—as sole basis of insanity

defense]; *People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1434 & fn. 5.)

No such limitation applies in the guilt phase, in which evidence of voluntary

intoxication and related mental disorders are admissible, pursuant to sections 28 and

29.4,[13] to show that a defendant actually lacked the requisite mental state, including,

when the charged offense is first-degree murder as here, that the defendant did not

deliberate and premeditate. (See, e.g., *People v. Ervin* (2000) 22 Cal.4th 48, 89-91

[discussing CALJIC No. 3.32, predecessor to CALCRIM No. 3428, and indicating that

evidence of defendant's "substance use disorder" caused by his past heavy cocaine and

heroin use warranted jury instruction on diminished actuality upon defense request];

*People v. Aguilar* (1990) 218 Cal.App.3d 1556, 1561, 1569, disapproved on other

grounds by *Ervin*, *supra*, at p. 91 [given expert testimony that defendant suffered from

paranoid personality traits that could have been caused or exacerbated by defendant's

cocaine use and were relevant to issue of whether he formed requisite mental state, trial

court erred in not instructing on diminished actuality]; *People v. Cox* (1990) 221

Cal.App.3d 980, 987-989, 991 [instruction on diminished actuality proper when

defendant suffered from psychosis that was likely caused by his drug use]; *People v.

Saille, supra,* 54 Cal.3d at pp. 1116-1117 [when crime requires particular mental state,

---

[13]Section 29.4, subds. (b) and (c), provide as follows: "(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. [¶] (c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

23.

defendant must have opportunity to prove he did not possess that state].)  Therefore, in the guilt phase, the jury is "free to consider both the long-term and immediate effects of substance abuse on defendant's formation of the requisite mental state." (*Ervin*, *supra*, at p. 91.)  In sum, in the guilt phase, evidence of both organic and substance-induced mental disorders can be exculpatory pursuant to a diminished-actuality theory, a point the People do not dispute.  (§ 28.)

As stated above, Hardin was charged with first-degree murder and presented evidence that he suffered from paranoid schizophrenia and a substance-induced mental disorder that caused him to have delusions, hallucinations, and other psychotic symptoms.  His theory of defense was that his psychotic symptoms prevented him from acting with deliberation and premeditation in killing Kabonic.  Accordingly, the judge instructed the jury with CALCRIM No. 521, which delineates and defines the mental state required for first-degree murder, including the elements of deliberation and premeditation, and CALCRIM No. 3428,[14] which addresses the diminished-actuality defense.  The jury was instructed with CALCRIM No. 521 as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  [¶] The defendant acted willfully if he intended to kill.  [¶]  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  [¶]  The defendant acted with premeditation if he decided to kill before completing the act that caused death.

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  [¶]  A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision

_____

[14]CALCRIM No. 3428 is entitled "Mental Impairment:  Defense to Specific intent or Mental State (Pen. Code, § 28)."

to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

> "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden you must find the defendant not guilty of first degree murder and the murder is second degree."

Thereafter, the jury was instructed with CALCRIM No. 3428, as follows:

> "You have heard that the defendant may have suffered from mental disease, defect or disorder. You may consider this evidence only for the purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime.

> "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically express malice aforethought and premeditation and deliberation for first degree murder or malice aforethought, either express or implied, for the lesser crime of second degree murder. If the People have not met this burden, you must find the defendant not guilty of the charged crime or the lesser included offense based on your finding."

The instruction did not define the terms "mental disease, defect or disorder" as used therein; nor was the jury instructed as to the definition of these terms in any other instruction.

### B.  Testimony of Dr. Michael Musacco, the defense expert in the guilt phase

Dr. Michael Musacco, a psychologist called by the defense in the guilt phase, testified on direct examination as follows: "My opinions are that Mr. Hardin suffers from pretty serious mental illness that has, I would say, substantial impact on his reality contact, his ability to know what's truly going on around him. It affects his mood, his perceptions of reality, his behaviors. [¶] The mental illness is chronic. It's been going on for a long time. It's had a significant impact on his functioning to the extent that he has been found to be disabled. He's been in and out of the legal system. His relationships have been affected." Dr. Musacco diagnosed Hardin's mental illness as severe schizophrenia, paranoid type, and added, "I also found that he suffers from

substance use disorder particularly associated with methamphetamine and alcohol. His use of those drugs exacerbates or worsens his mental disorder. [¶] It's not uncommon, in fact it's common, for persons with a major mental illness to suffer from a co-existing substance use disorder, and I found that to be the case in Mr. Hardin's situation."

Musacco described the symptoms of schizophrenia as including an impaired ability to communicate; disorganized thoughts and speech; auditory hallucinations and hearing voices other people cannot hear; tactile hallucinations" or "feel[ing] things that aren't there"; "[s]omatic types of hallucinations, i.e., "things that are going on inside [the] body"; and delusional beliefs. Musacco concluded that "in general [schizophrenia] tends to be a lifelong illness, and clinically what we see with [Hardin], that seems to fit the pattern."

Musacco then described Hardin's specific symptoms, including "[v]ery prominent delusional beliefs; inescapable, severe delusional beliefs that really affected the course of my interview with him." Musacco noted that the network was a very real phenomenon for Hardin, subjecting him to ongoing mental and emotional torture.

Musacco testified that he understood the legal definitions of the terms "deliberate[d]" and "premeditated" as set forth in CALCRIM No. 521.[15] He further testified that paranoid schizophrenia could "[a]bsolutely" affect the ability to act with deliberation and premeditation because it "profoundly" impacts "thought processes" and "perceptions of reality," resulting in "confused and disorganized" thoughts and "perverted" perceptions such that "a person's entire sense of reality is upside down." He stated that impulsivity can also be associated with paranoid schizophrenia but that usually the impulsivity emanated from the person's misapprehension of reality.

---

[15]The jury was instructed with CALCRIM No. 521, which states that "[t]he defendant is guilty of first degree murder if the People have proved that [he] acted willfully, deliberately, and with premeditation," and defines the terms "willfully," "deliberately" and "with premeditation."

26.

Musacco further testified that, "I think it's pretty well accepted now the vast majority of persons with mental illness also have or have had some form of substance abuse disorder that co-exists with their mental disorder. You can't just treat one and successfully treat the condition. You've got to treat both, the substance abuse disorder and the mental illness."

The prosecutor then cross-examined Musacco, shifting the focus to Hardin's methamphetamine use. The prosecutor's line of questioning reveals he sought to show that Hardin's delusional beliefs, hallucinations, and other psychotic symptoms stemmed from a substance-abuse disorder caused by his methamphetamine addiction rather than from paranoid schizophrenia, and, indeed, that Hardin may not suffer from schizophrenia at all.

With his opening questions, the prosecutor established that, although Musacco addressed the symptomology of schizophrenia on direct examination, he had also specifically diagnosed Hardin with a polysubstance-abuse disorder based on Hardin's abuse of alcohol and methamphetamine. The prosecutor continued to focus on Hardin's substance-abuse disorder throughout his cross-examination, as follows:

"Q [by the prosecutor]. [Y]ou are familiar with what certain substances, specifically drugs, do to people who abuse them?

"A [by Musacco]. Yes.

"Q. Okay. *And would it be fair to say that a long term methamphetamine abuse also produces the same kind of symptomology that schizophrenia shows?*

"A. *They can—the symptoms of somebody with methamphetamine—a person using a lot of meth can show auditory hallucinations, delusional beliefs, impaired reality contact. The symptoms can mimic one another, and they can be very difficult to determine, you know, what the cause of it is.* However, there are some ways to look at that.

"Q. *But they do mimic one another in terms of the symptomology you described?*

27.

"A. *Yes. Very much so.* [¶] … [¶]

"Q. … *It would be fair to say that the defendant has acknowledged and admitted to you, as well as other mental health professionals, a long history of methamphetamine abuse?*

"A. *Yes. I would agree with that.*

"Q. Okay. And, in fact, the first physician to see him in terms of a mental health professional was a Dr. Prather?

"A. Yes.

"Q. That was 2004?

"A. There was reference to a suicide attempt occurring prior to that, but I have no records for that, but 2004 records are the first ones that I have access to.

"Q. Okay. Actually show him going to a mental health professional?

"A. Yes.

"Q. That's what Dr. Prather was?

"A. Correct.

"Q. In fact, Dr. Prather says this is—he says that this is the first time [Hardin] had seen a psychiatrist or been involved in any kind of psychiatric care, referring to the defendant?

"A. Okay.

"Q. Does that sound accurate?

"A. Yes. That sounds accurate.

"Q. I've got it here if you need to look at it.

"A. No. That's okay.

"Q. Sound right to you? [¶] In there he actually says in terms of interviewing the defendant and trying to diagnose him, unfortunately, at the time I initially saw him he had been clean for methamphetamine for less than a month. Does that sound right?

"A. Yes.

"Q. *So a firm diagnosis could not be made?*

"A. *Correct.*

"Q. *And is that because, as you said a moment ago, methamphetamine abuse mimics in many ways, not most ways, schizophrenia?*

"A. *Yes.* [¶] … [¶]

"Q. Dr. Prather indicated that [Hardin] started using crank, which is a form of amphetamine. That would be referring to actual methamphetamine?

"A. Methamphetamine, yeah.

"Q. He started using that at the age of 17 years old?

"A. Yes.

"Q. And he described that he got up to—at that point in time, January of '03 till shortly before he saw Dr. Prather, an almost daily use of the drug?

"A. Yes. [¶] … [¶]

"Q. I think one of them was Truxtun Psychiatric?

"A. Yes.

"Q. *And multiple—most of the times he's seen he is diagnosed with either—well, schizophrenia of some sort or another but they also diagnosed him with a drug disorder?*

"A. *I would agree with that, yes.*

"Q. He acknowledged—in fact, they repeatedly tell him throughout the records, again apologize for summarizing, but to really figure out what's going on with him he needs to get off of meth?

"A. I would agree with that. However, I would also say that may misstate it, because the vast majority of people have said he's got schizophrenia and a drug use disorder.

"Q. Right.

"A. But, you know, the rule is, and this is where I would agree with you, if somebody's coming in and they're on drugs and they may be mentally ill, what you want to do is get them off the drugs and let's see if those symptoms continue while they're drug free and/or getting mental health treatment. If that's the case then we can kind of rule out that it may be a drug related mental illness.

"Q. That's an issue that Dr. Prather first keyed into originally in 2004 and also something you at least had to grapple with. Would that be accurate?

"A. Yes.

"Q. During your first interview, the one in September 2010, what did he tell you regarding his drug use?

"A. Regular use of methamphetamine. Regular use of alcohol. He had been, I think, meth free for a period of several days, maybe a week prior to the date of the offense. [¶] He was trying to get clean so he could enter the Teen Challenge program.…

"Q. *In fact, in your report he told you he had a daily use of methamphetamine prior to July of 2010?*

"A. *Yes.*

"Q. *He told you that he used substance intravenously?*

"A. *Yes.*

"Q. That means with a syringe?

"A. Correct.

"Q. And approximately a dime per day?

"A. Ten dollars.

"Q. Ten dollar amount of meth?

"A. Yes.

"Q. How much meth is that if you're aware?

"A. You know, I think that's about like one shot, maybe turn it into two shots. It's not a lot. However, if a drug user tells you they're using a dime, they might be using two. So you take—

30.

"Q. So you would agree with me they tend to under report how much they're using?

"A. Yes. Yes. I think that that's pretty common and universally understood. That's not to say people wouldn't accurately report it, but it's a self-report. You take it with a grain of salt. [¶] … [¶]

"[Q.] To be clear, and I think your direct testimony was very clear, all that you're saying is in terms of premeditation and deliberation committing, say, a murder is that people with schizophrenia, it's possible that can affect them but it's also possible they can sort through the options, review the potential consequences, and go ahead and make a decision?

"A. Lots of people with a severe mental disorder commit crimes that may not be related to their mental illness whatsoever. [¶] … [¶] So most of the time, even people with mental illnesses, their crimes are committed out of criminality rather than mental illness.

"Q. I was going to ask you that. All the terms you discussed during your direct, competency, what NGI is briefly, and premeditation, these are legal concepts. They're not psychological concepts?

"A. Yes.

"Q. So what you're attempting to do is apply your expertise as a psychologist to the legal concepts that are presented by the law?

"A. Correct.

"Q. You indicated that you had talked to the defendant's mother. Did you at any point talk to his Aunt Tamara Hume?

"A. No.

"Q. You did review her statement?

"A. Yes.

"Q. I believe I provided you with a transcript of her interview. Do you recall that?

"A. I know you—a typed out transcript?

"Q. Yes.

"A. I don't recall that.

31.

"Q. *Okay. Assume for a moment she told the detective when she was interviewed that all of his issues started with methamphetamine. Would that be the kind of witness that you would want to talk to who was kind of around him at the beginning?*

"A. *Sure could. Again going back to the idea that in a mental illness and substance abuse commonly exist or co-exist [sic], that may be important….*

"Q. *That would also coincide with what Dr. Prather said, that it was difficult to confirm the diagnoses because of the mimic[k]ing symptomology?*

"A. *It can be very difficult, yes,* particularly in the short run. [¶] … [¶]

"[Q.] You indicated that long term methamphetamine abuse, are you familiar with physically what—when people use methamphetamine, what does it physically do to them?

"A. There's—are you talking mentally or physically? [¶] The, you know, breakdown in their body is tooth decay, lesions on their arms.

"Q. Let's talk with physically. Physically what can it do?

"A. Commonly you see people with a bad meth disorder they've lost a lot of their teeth due to the dental hygiene issues that come up with methamphetamine. You'll see sores on their body having to do perhaps with, you know, collapsed veins, using … needles that aren't completely clean. Not just the fact that they're putting basically, you know, a homemade, you know, toxin in their bloodstream, but then they're leading a life-style that goes along with it, which isn't [eating] healthy, sleeping healthy, bathing regularly. [¶] … [¶] *But in terms of mentally, what happens the biochemical things that occur in methamphetamine is similar to the biomedical actions that occur in the brain of a person with schizophrenia. [Their] brain chemicals, if you will, get out of whack, and **that's why it can be difficult to distinguish between someone who has a meth induced psychosis and schizophrenia**. [¶] The same brain chemicals that are in abundance in the person with methamphetamine is the same in schizophrenia.* Where you tend [to] see the differences then afterwards is when the person has been off the meth or they've been treated that stuff goes away whereas that is not the case with schizophrenia. But the brain chemical that's involved, the actions in the brain are very similar.

"Q. *Okay. In fact, when they take methamphetamine, it raises—one of the things that it does biochemically is [it] raises the dopamine levels?*

32.

"A. *Yes. Yeah. Dopamine is the specific brain chemical that gets elevated that is found elevated in persons with schizophrenia that don't use meth.*

"Q. *So then it's even more complicated when you are trying to decide between the two. Correct?*

"A. Well, you can't—don't do a brain chemical test for anything, for any mental illness really.

"Q. The levels—isn't it true that the levels of—dopamine is the chemical in your body that makes you feel good?

"A. It's one of them, yes.

"Q. When you—the meth raises it incredibly high?

"A. Yes.

"Q. And one of the problems with chronic meth abusers is they get used to the high level of dopamine?

"A. Correct.

"Q. *And so they—even when they withdraw from it, they still experience hallucinations and other things because their body doesn't have the level of dopamine that they're accustomed to. Is that accurate?*

"A. *That can be part of the [symptoms], yes.*

"Q. So some of the things they will talk about are in terms [of] delusions because of this meth, withdrawal or abuse, is that organs are separated from their body?

"A. Very often there's physical kinds of components like that.

"Q. That sometimes call it crank bugs. They talk about bugs bouncing off their head?

"A. Bugs, that's common in meth. It can exist in schizophrenia, but it's also common in meth. [¶] … [¶]

"[The prosecutor]: I don't have any further questions." (Italics and bolding added.)

After the prosecutor's cross-examination, Musacco, on redirect, addressed the concept of "dual diagnosis," i.e., that substance-induced disorders are often seen

33.

alongside mental illnesses such as schizophrenia; he also characterized Hardin's schizophrenia as "severe." The prosecutor then recross-examined Musacco exclusively on the issue of Hardin's substance-induced psychosis, as follows:

"Q [by the prosecutor]. Would you also characterize—would it be fair to say Mr. Hardin's polysubstance abuse methamphetamine use is also severe?

"A. Yes.

"Q. And would it be fair to say that both of the issues manifested at the same time in terms of in 2004 when he first presented both issues were on the table?

"A. I don't think that we can—we can say with certainty if—what happened first, the chicken or the egg. Very often things happen coincidentally. [¶] A person that is vulnerable to schizophrenia may be vulnerable to a substance induced psychotic illness as well, but it's more common than not that those things co-exist. You can have a lot of people that do drugs that don't have schizophrenia. You can have a lot of people that do drugs that develop short acting symptoms of schizophrenia.

"Q. *But in Mr. Hardin's case when it presented it was both of them?*

"A. *It—yeah, I don't think that we can—we can't tear apart and say where does the methamphetamine come in versus the—you know, because the methamphetamine clearly played a negative role in this man's life, clearly exacerbated his mental illness.*

"Q. And they presented at the same time?

"A. At the time of the offense?

"Q. In terms of—Dr. Prather was the first reported mental health professional to see the defendant. Right?

"A. That we have documentation of, yes.

"Q. *In terms of his symptomology, whatever is causing it, whether it's schizophrenia or drugs or both, they all merged at approximately the same time as best you can tell from those records?*

"A. *From that doctor's note that is accurate.*

34.

"[The prosecutor]:  Thank you, Judge."  (Italics added.)

## C.     *Defense's closing and prosecutor's rebuttal arguments*

After the prosecutor's cross-examination of Dr. Musacco, the judge instructed the jury, including with CALCRIM Nos. 521 and 3428, and closing arguments followed. With reference to CALCRIM Nos. 521 and 3428,[16] the defense argued that Hardin was not guilty of first-degree murder because, as a result of his mental illness and "self-medicating" with methamphetamine, he did not actually deliberate and premeditate; rather, the ongoing delusions, hallucinations, and distorted perceptions about being persecuted by a network led him to "snap[]" or "explode[]" and stab Kabonic in the grip of a psychosis.

Defense counsel told the jury in closing argument, "[a]s you probably figured out a long time ago, this is a pretty unusual case in that it's not a who done it.  It's not a murder that happened where we're saying Mr. Hardin didn't do it, Mr. Hardin wasn't there, it was somebody else.  It's kind of unusual in that regard."  Defense counsel then stated that Hardin killed Kabonic, but the purpose of the trial was to determine whether Hardin was guilty of first- or second-degree murder.  Defense counsel discussed the mental state required for first-degree murder and contended that Hardin's crime was "heinous … but it was not first degree murder because there was no premeditation and deliberation."  He continued as follows:

> "How do we know this?  There's too many reasons we know it wasn't deliberated and premeditated.  The first is the fact of the case itself.  The second is the mental health issues that Mr. Hardin has had for many years.  [¶]  Let's talk about the first factor, the fact[s] of the case.  [¶] … [¶] It was a quick, rash event.  Mr. Hardin had no motive to kill Mr. Kabonic.  [¶] … [¶] [It was an] unexpected, quick, violent encounter that no one saw coming.

---

[16]The reporter's transcript indicates that counsel referenced CALCRIM No. "2428" as the instruction regarding "mental impairment and how that applies to a defense."  However, it is clear that counsel was discussing CALCRIM No. 3428, and the error in the reporter's transcript appears to be typographical.

"The second factor is Mr. Hardin's mental illness. You might ask why this is important. [¶] It's important because you'll get a jury instruction, number [3428], that talks about mental impairment and how that applies to a defense.

"That instruction reads you heard evidence that the defendant may have suffered a mental disease, defect or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] … [¶]

"The one I'll talk about is premeditation and deliberation. Okay. So, in other words, you can consider evidence of Mr. Hardin's mental illness in evaluating whether he acted with premeditation and deliberation on the night that he killed Michael Kabonic.

"So why is it important? [The prosecutor] referred to it as a Hail Mary, but it's not that at all. [¶] Listen to what Dr. Musacco testified to this morning. He said Jeffrey Hardin suffers from schizophrenia, paranoid type. It's not something that occurred recently last week or in the last year or even the last three years. It's something that's been going on and been documented for the past roughly nine years or so. [¶] … [¶]

"He also diagnosed … his level of paranoid schizophrenia as severe. He talked about various levels, various levels of mental illness. He said he would classify Mr. Hardin's level of mental illness as severe.

"He talked about Mr. Hardin's delusions. You heard some of them in the recorded interview talk about the network. You heard something about his intestines coming out of his body. Again, these are delusions that have afflicted Mr. Hardin not before this case but many, many years going back to when he was almost a teenager.

"Dr. Musacco testified how schizophrenia, paranoid type, influences someone's brain, what effects it has. He said it affects thinking, affects reason, judgment, affects their reality contact. Their very perception of reality, what's going on, is completely different than a normal person. [¶] They suffer from delusions, confused thoughts, misperceptions, and they can be impulsive. That's very important when you're talking about whether this crime was deliberated upon, whether it was premeditated. This mental illness goes right to that issue. [¶] You can't think of Mr. Hardin as the normal guy off the street. You have to think of him as he is, a mentally ill person.

36.

"Dr. Musacco testified.  [The prosecutor] cross-examined him and said, well, can a person with schizophrenia, paranoid type, premeditate and deliberate?  He said, yes, it's possible.  Depending on the level of mental illness, could premeditate a deliberate act, but he also said, generally speaking, this type of disease generally impairs the ability to premediate and deliberate.  It impairs the ability to premediate and deliberate an act. [¶] … [¶]

"What does the evidence show?  The evidence makes pretty clear what happened here.  [¶]  Jeffrey Hardin was staying with his aunt.  He's severely mentally ill, been that way for many years.  He's been tormented for many years, at least in his mind, by this network, feelings of persecution, feelings that they were somehow a threat to his family, hallucinations, delusions.  He thought about hurting someone for a long time.

"He was kind of building up over time.  He thought about hurting someone.  He didn't do it, but he was thinking about it.  It was something that was building to a head.

"It didn't help the issue by self-medicating himself with methamphetamine, and that probably at least in some way played some type of factor.

"One moment—nobody knows why, probably nobody ever will— one moment sometime between getting his food and taking it to his room, Douglas and Tamara hearing the commotion, a switch went off in his head. It wasn't something that was planned, wasn't something orchestrated.  Just in that moment, for whatever reason, something went off in his brain and he did what he did.

"Almost like a volcano.  He's there one day and all [of a] sudden he explodes.  [¶] … [¶]

"We know from Dr. Musacco's testimony and from the testimony of his aunt, Tamara Humes, Jeffrey has been talking about the network for years. At least six years before this killing he had been talking about the network, telling people about it, and everyone said, hey, I don't know what you're talking about.  [¶]  It wasn't real.  We all know it wasn't real, but to Jeffrey in his mind on that evening it was real, and that played a huge role in what he did.

37.

"So, as I said. It was in his head a long time. The night of August 4th it just exploded and … Michael Kabonic was the guy that bore the brunt of it. [¶] … [¶]

"[What we have here is a] [m]entally ill person being tormented for years. He has a knife for whatever reason. He's planning on doing something. He pulls a knife out. Something snaps in his head. He goes over and does it. It's done. [¶] In seconds it was over. It wasn't planned. It wasn't orchestrated. It wasn't thought through. It wasn't premeditated murder. [¶] … [¶]

"Your job is to look at CALCRIM [No.] 521, understand it, apply [the] law to the facts, take into consideration the facts of the case, how quickly it happened, Dr. Musacco's testimony about Jeffrey's mental illness, long ongoing mental illness, and just find … reasonable doubt that there was premeditation and deliberation and find Jeffrey Hardin not guilty of first degree murder."

In his rebuttal argument, the prosecutor noted that the jury instruction on the "mental health" issue was framed in terms of a "mental disease," and added that the evidence in this case raised a real question about whether Hardin's delusional symptoms, i.e., his talk "about crazy networking stuff," were caused by schizophrenia or his methamphetamine-induced disorder. Specifically, the prosecutor told the jury:

"So it's abundantly clear that on each of those, willfully, deliberately, and with premeditation—again three separate things—but the evidence is there, and just because he talks about crazy networking stuff—one of the things Dr. Musacco said this morning was he doesn't know and can't tell you which came first, the methamphetamine abuse or the mental health issues, *but what he did tell you was isn't it amazing that he starts having problems at the same time he starts to use the drugs?*

"And it's not like I'm telling you something where they don't match up. The word Dr. Musacco used was mimic. The symptoms look the same. [¶] And we heard from Tamara Humes he was a straight A student before the meth." (Italics added).

Defense counsel objected to the prosecutor's line of argument as constituting "improper argument" but the court overruled the objection.

The prosecutor continued:

"So when you're looking at—the instruction on this mental health issue is [sic] may have suffered from a mental disease, and I think there is a real debate as to *whether it's really schizophrenia* or it's methamphetamine caused[,] especially [in] someone who told Dr. Musacco that he was using intravenously, was shooting up [every day] and was using $10 worth, which he called either one syringe or two syringes full, but he also told you that people who admit drug use tend to underreport and minimize."  (Italics added.)

### D.    *Prosecutor committed prejudicial misconduct by mischaracterizing the scope of the diminished-actuality defense*

In his rebuttal comments, the prosecutor drew a distinction between schizophrenia and a drug-induced or "methamphetamine caused" disorder, with reference to CALCRIM No. 3428, "the instruction on this mental health issue."  The unmistakable implication of the prosecutor's comments was that the distinction was legally significant, when, in fact, it was not.  The prosecutor made the same point through his cross-examination of Dr. Musacco, i.e., that it mattered whether Hardin's delusions and distorted perceptions were caused by his schizophrenia or his substance-abuse disorder, when, in fact, for purposes of the jury's consideration of these psychotic symptoms, it did not matter at all.  Taken in conjunction with his cross-examination of Dr. Musacco, the prosecutor's rebuttal comments gave rise to the legally incorrect inference that, in contrast to evidence of an organic mental disorder, evidence of a drug-induced mental disorder was not exculpatory under CALCRIM No. 3428.  More specifically, the prosecutor's comments implied that, in assessing whether Hardin had the requisite mental state, the jury could not consider the evidence of Hardin's delusional symptoms if these were related, to any extent, to his substance-abuse disorder, because the latter was not a mental disease, defect, or disorder within the meaning of CALCRIM No. 3428.  The prosecutor thus effectively misstated the law applicable to diminished actuality, i.e., section 28 as reflected in CALCRIM No. 3428.

In so mischaracterizing the scope of the diminished-actuality defense, the prosecutor committed misconduct under the applicable standards, and, in light of the record as a whole, the error was prejudicial.

### 1. Legal standards

Although counsel have wide latitude in discussing the legal and factual merits of a case, "it is improper to misstate the law." (*People v. Bell* (1989) 49 Cal.3d 502, 538; *People v. Hill* (1998) 17 Cal.4th 800, 829 (*Hill*).) Moreover, "'[a] prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation].'" (*Hill*, *supra*, at p. 820.) Indeed, "[i]t is well settled, requiring no citation of authority," that "improper remarks in the opening statement, improper examination or cross-examination, or improper argument" by a prosecutor in a criminal trial constitutes prosecutorial "'misconduct.'" (*People v. Asta* (1967) 251 Cal.App.2d 64, 86-87, disapproved on other grounds by *People v. Bolton* (1979) 23 Cal.3d 208, 213 (*Bolton*).)

More generally, a prosecutor commits misconduct by using deceptive or reprehensible methods of persuasion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.) It is not necessary for the defendant to show the prosecutor acted in bad faith because the prosecutor's conduct is evaluated in accordance with an objective standard. (*Ibid*.; see also *People v. Crew* (2003) 31 Cal.4th 822, 839 ["Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct."]; *Bolton*, *supra*, 23 Cal.3d at p. 214 ["'[Injury] to [defendant] is nonetheless an injury because it was committed inadvertently rather than intentionally.'"]; *Hill*, *supra*, 17 Cal.4th at pp. 822-823 & fn. 1 ["[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind[;] [a] more apt description of the transgression is prosecutorial error."].) Finally, when a claim of

misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"Prosecutorial misconduct, however, will not be grounds for reversal unless it is shown to be prejudicial." (*People v. Villa* (1980) 109 Cal.App.3d 360, 366.) Just as a finding of misconduct hinges on fairness to the defendant rather than the intentionality of the prosecutor, so too is reversal of judgment on the basis of prosecutorial misconduct "designed not so much to punish prosecutors as to protect the fair trial rights of defendants." (*Bolton*, *supra*, 23 Cal.3d at p. 214.) The *Bolton* court held that either of the two traditional tests of prejudice could apply to a particular instance of misconduct: "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.] However, if federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Chapman v. California* (1967) 386 U.S. 18, 24.)" (*Ibid.*)

Finally, before addressing the merits of this issue, we note the People do not argue that Hardin has forfeited this claim. Indeed, the issue is properly before us. To preserve for appeal a claim of prosecutorial misconduct, Hardin must make a timely objection at trial and request an admonition to the jury. (*People v. Farnam* (2002) 28 Cal.4th 107, 167.) "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.]" (*Hill*, *supra*, 17 Cal.4th at p. 820.) The "absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a

41.

request.'" (*Id.* at pp. 820-821, quoting *People v. Green* (1980) 27 Cal.3d 1, 35, fn. 19, abrogated on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225.)

Here, defense counsel objected to the prosecutor's misleading rebuttal comments as being improper, but the court immediately overruled the objection, thus depriving counsel of a basis to request a curative admonition. (See *People v. Green*, *supra*, 27 Cal.3d at p. 35 [issue of prosecutorial misconduct preserved for review in absence of request for curative admonition where counsel objected on basis of improper argument but court overruled objection].) We also have the discretion to reach the issue even if it were forfeited. (*People v. Smith* (2003) 31 Cal.4th 1207, 1215.)

### 2. Analysis

Here, the defense adopted the theory of diminished actuality to argue that Hardin was guilty of second-degree murder but not first-degree murder. Specifically, based on relevant expert testimony, Hardin argued that his delusional symptoms prevented him from deliberating and premeditating, both of which were elements the prosecution was required to prove beyond a reasonable doubt in order to obtain a conviction for first-degree murder. Hardin's theory of defense was squarely encompassed by CALCRIM No. 3428 on account of Dr. Musacco's testimony that Hardin suffered from diagnosed mental disorders, i.e., paranoid schizophrenia and drug-induced psychosis, which caused a disordered and delusional thought process and impaired his perception of reality, and that these symptoms could, in turn, impair his ability to deliberate and premeditate. Accordingly, defense counsel urged the jury to consider the evidence of Hardin's schizophrenia in assessing his mental state pursuant to CALCRIM No. 3428.

The prosecutor questioned whether Hardin even had schizophrenia and argued that Hardin's symptoms were more likely caused by his methamphetamine-use disorder: "Dr. Musacco said this morning … he doesn't know and can't tell you which came first, the methamphetamine abuse or the mental health issues, *but what he did tell you was isn't it amazing that he starts having problems at the same time he starts to use drugs?*

42.

[¶] … [¶]  And we heard from Tamara Humes he was a straight A student before the meth.  [¶] … [¶] …  So when you're looking at—the instruction on this mental health issue … may have suffered from a mental disease, and I think there is a real debate *as to whether it's really schizophrenia* or it's methamphetamine caused .…"  (Italics added).  The prosecutor's point was reinforced by his cross-examination of Dr. Musacco in which the prosecutor also sought to show that Hardin's symptoms matched the symptoms of both schizophrenia, as well as methamphetamine-use disorder, and, in his case, were likely caused by the latter disorder.[17]  However, the prosecutor's argument was misleading and, in effect, deceptive, because it suggested that the source of Hardin's delusional symptoms, i.e., whether they were caused by schizophrenia or a substance-induced disorder, was material for the application of CALCRIM No. 3428, when it was not.  The jury could consider Hardin's delusional symptoms in assessing his mental state under CALCRIM No. 3428 and whether they were caused by his schizophrenia, his drug-induced disorder, or both.  The prosecutor's comments, on the other hand, suggested that, in assessing Hardin's mental state, the jurors had to disregard his delusional symptoms entirely if they determined the symptoms were caused by his substance-abuse disorder, or even if they were unsure whether his symptoms were caused by schizophrenia or his substance-abuse disorder.  The prosecutor's argument thus mischaracterized the law.

We further conclude there is a reasonable likelihood the prosecutor's remarks misled the jury.  (See *People v. Frye* (1998) 18 Cal.4th 894, 970 ["To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an

---

[17]The prosecutor similarly addressed the relationship between Hardin's methamphetamine use and his delusional symptoms when questioning his aunt, Tamara Humes, in the guilt phase of the trial.  In rebuttal, the prosecutor argued, based on Humes's testimony, that "[t]he symptoms [of schizophrenia and methamphetamine-induced disorder] look the same.  [¶]  And we heard from Tamara Humes he was a straight A student before the meth."

improper or erroneous manner."], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Here, the jury was instructed, via CALCRIM No. 3428, that it could consider evidence of Hardin's mental disorder(s) for the sole, limited purpose of assessing his mental state at the time of the crime. However, neither CALCRIM No. 3428 itself, nor any other instruction, clarified that the jury could consider evidence of organic mental disorders as well as drug-induced psychoses under this instruction.

Further, the import of the prosecutor's comments was strongly reinforced by his cross-examination of Dr. Musacco, in which the prosecutor tried to show that Hardin's symptoms were caused by his methamphetamine-induced disorder rather than schizophrenia, and that Hardin may not even have had schizophrenia as his psychological symptoms began when he started abusing methamphetamine. In his own closing, defense counsel did not rebut the misleading implications of the prosecutor's cross-examination of Dr. Musacco, i.e., that CALCRIM No. 3428 encompassed only organic mental disorders to the exclusion of substance-abuse disorders. Defense counsel did, however, object to the prosecutor's improper rebuttal comments but the judge overruled the objection, thereby bolstering the prosecutor's argument. Finally, since the prosecutor made his misleading comments in his rebuttal closing, defense counsel had no opportunity to respond directly to them. Thus, there is every reason to believe that the jury drew and applied the only logical inference from the comments: It could consider Hardin's delusional symptoms in assessing his mental state only if the symptoms were caused by schizophrenia; to the extent the jury believed the symptoms were related to Hardin's substance-abuse disorder in any way, it had to disregard the symptoms entirely. Since the prosecutor's comments mischaracterized the law, and there is a reasonable likelihood the jury was misled, the comments constituted misconduct.

For the prosecutor's error to be reversible, it must be prejudicial under the facts of the case. Here, the error was prejudicial under both the *Watson* and *Chapman* standards.

(*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) [error warrants reversal if it appears reasonably probable that result more favorable to defendant would have occurred absent error]; *Chapman v. California*, *supra*, 386 U.S. at p. 24 [state must prove that error did not contribute to verdict].)

The jury was instructed on first- and second-degree murder. Under section 28, evidence of mental disease or disorder is admissible "solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Section 28 is thus relevant to whether Hardin had the requisite mental states applicable to first- and second-degree murder, respectively. (See, e.g., *People v. Whitfield* (1994) 7 Cal.4th 437,[18] 450; *People v. Reyes, supra,* 52 Cal.App.4th at pp. 982-986; *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 592; *People v. Saille, supra,* 54 Cal.3d at pp. 1116-1117; *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1442-1443.) The trial court instructed the jury as to the mental state required for second-degree murder, as well as the mental state required for first-degree murder, and further instructed the jury pursuant to CALCRIM No. 3428 as follows:

> "You have heard that the defendant may have suffered from mental disease, defect or disorder. You may consider this evidence only for the purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime.
>
> "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically express malice aforethought and premeditation and deliberation for first degree murder or malice aforethought, either express or implied, for the lesser crime of second degree murder. If the People have not met this burden, you must find the defendant not guilty of the charged crime or the lesser included offense based on your finding."

---

[18]Superseded by statute on another ground in *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123-1126 and *People v. Martin* (2000) 78 Cal.App.4th 1107, 1113-1115.

CALCRIM No. 3428 was critical to Hardin's defense, and the prosecutor's mischaracterization of its scope potentially affected the jury's deliberations as to both first- *and* second-degree murder.

Through his cross-examination of Dr. Musacco, the prosecutor sought to show that Hardin had a substance-induced disorder and not schizophrenia, and that his delusional and psychotic symptoms were caused by the substance-induced disorder.

Next, in his rebuttal comments, the prosecutor argued that "the instruction on this mental health issue … may have suffered from a mental disease, and I think there is a real debate *as to whether it's really schizophrenia* or it's methamphetamine caused .…" (Italics added.)

In combination, the prosecutor's cross-examination and his rebuttal comments created the erroneous impression that drug-induced psychosis was not exculpatory under the law.[19] Put differently, the jury was led to believe that only symptoms independently caused by organic mental diseases were exculpatory under the law. The prosecutor's tactic narrowed the scope of the diminished-actuality defense as delineated in CALCRIM No. 3428. If the jury determined that Hardin's delusional and psychotic symptoms were caused to any extent by his methamphetamine-induced disorder, it would have to disregard them in assessing his mental state in committing the offense. The error thus tainted the jury's consideration of the question whether Hardin was guilty of first-degree murder, as well as the question whether he was guilty of second-degree murder.

The People's theory was based in large part on Hardin's police interrogation on the night of the killing; however, substantial portions of the statement were incoherent and reflected Hardin's delusional beliefs about the network. The prosecutor argued that Hardin's responses in the interrogation indicated he had resolved to kill Kabonic before

---

[19]Even though the defense did not specifically argue that Hardin's drug-induced psychosis was exculpatory under CALCRIM No. 3428, the jury could still have found it to be so absent the prosecutor's error.

he completed the act and he was aware his actions were wrong. The prosecutor argued that this evidence, along with other facts (e.g., that Hardin fled from the scene after the murder; that he tried to kill Jones, who had witnessed the attack on Kabonic, by throwing a knife at him; and that he took a knife from his room and went along the corridor to Kabonic's room and attacked him in bed when he was most vulnerable), revealed that Hardin acted with deliberation and premeditation. The defense attempted to refute the prosecution's theory that Hardin acted with deliberation and premeditation. Counsel highlighted the suddenness of the attack and the lack of a motive, arguing that Hardin did not deliberate or premeditate but, rather, reached a breaking point as a result of his long history of delusions, hallucinations, and other psychotic symptoms caused by his paranoid schizophrenia. CALCRIM No. 3428 was directly relevant to the jury's consideration of the narrow issue presented by the parties: Did Hardin deliberate and premeditate in killing Kabonic? In suggesting that the jury could not refer to CALCRIM No. 3428 if it believed Hardin's symptoms were in any way related to his methamphetamine-induced disorder, the prosecutor's error was prejudicial.

Since it is reasonably probable the outcome of the proceeding would have been more favorable to Hardin absent the prosecutor's error, we reverse the judgment and remand the matter for a new trial.[20] (See *Watson, supra,* 46 Cal.2d at p. 837.) We note that reversal of the judgment would also necessarily require the retrial of Hardin's insanity defense, assuming he re-enters pleas of not guilty and not guilty by reason of insanity on remand and is convicted upon retrial of the guilt phase. (See *People v. James* (2015) 238 Cal.App.4th 794, 813, fn. 6 ["In the eyes of the law there is only one trial even though it is divided into two sections or stages if insanity is pleaded as a defense."].)

---

[20]Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.)

## II. *Sufficiency of the evidence for a first-degree murder conviction*

Hardin argues the evidence in the record was insufficient to "prove deliberation and premeditation beyond a reasonable doubt," and, in turn, to convict him of first-degree murder. He contends that, given the "sudden and rash" nature of, as well as the lack of motive for, the killing, the evidence supports at most, a finding of second-degree murder.[21] Finally, Hardin asserts that the repeated references to "the network" and the many incoherent responses that are woven throughout his police interrogation further confirm that his delusional state precluded him from deliberating and premeditating as required for first-degree murder.

The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well established:

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.… We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

Here the jury considered the entirety of Hardin's police interrogation. Hardin explained how the attack on Kabonic unfolded. Hardin said he took his dinner to his room. He took a knife from his bag (he had taken the knife from his stepmother's house about two weeks earlier) and "attacked [Kabonic]." Hardin explained that Kabonic "was in bed he was just laying down on his back," and "I walked up there[,] I stabbed him

---

[21]Tamara Hume testified that, about two or three minutes after she told Hardin to leave the table, she heard Kabonic yell that Hardin was stabbing him. Hardin had never had a conflict with Kabonic, and Ms. Hume could perceive no reason for the attack.

and … I just hurt him. [¶] … [¶] I did." He did not have a quarrel with Kabonic and had not planned to kill him: "I [did not] plan … it … or two weeks ago … like I said it's been … years coming on it's been years," but acknowledged that Kabonic was in the wrong place at the wrong time. Hardin admitted he knew the stabbing would kill Kabonic and he knew it was wrong. Hardin also understood he would get into trouble and go to jail for doing what he did and consequently he left the scene in his aunt's truck. Specifically, he stated: "I broke the law I hurt somebody and then I took a truck and then I left it and it's a lot." Hardin explained that, after he fled in the truck, he wanted to turn himself in or get arrested, and so he intentionally crashed the truck, albeit at a low rate of speed so he could jump out of it without injury before it crashed.

The prosecutor argued that Hardin's interrogation responses indicated he had resolved to kill Kabonic before he completed the act and that he was aware his actions were wrong. The prosecutor argued that this evidence, along with other facts (e.g., that Hardin fled the scene after the murder; that he tried to kill Jones, who had witnessed the attack on Kabonic, by throwing a knife at him; and that he took a knife from his room and went along the corridor to Kabonic's room and attacked him in bed when he was most vulnerable) indicated that Hardin knew what was going on and acted with deliberation and premeditation.

Dr. Musacco, the only expert witness to testify in the guilt phase, diagnosed Hardin with severe paranoid schizophrenia, as well as a substance-induced disorder; the symptoms of both disorders included "auditory hallucinations, delusional beliefs, [and] impaired reality contact." Musacco opined that Hardin's schizophrenia was exacerbated by his long-term substance abuse. Finally, Musacco testified that paranoid schizophrenia can impair the ability to premeditate and deliberate because it profoundly alters an affected person's perception of reality and results in a disorganized and confused thought process, but, "[a]t the same time[,] a person with schizophrenia can make decisions that are based on reality and act on them without being influenced by their mental illness."

49.

Based on this record, we conclude the evidence was sufficient for a reasonable trier of fact to find that Hardin committed first-degree murder, i.e., that he killed Kabonic willfully, deliberately, and with premeditation and express malice aforethought.  We recognize that the record would also support a contrary finding and that the jury's ability to consider the psychiatric evidence properly in this case was constrained by the prosecutorial error addressed above.  Nonetheless, the totality of evidence in the record is sufficient to support Hardin's first-degree murder conviction.  (See, e.g., *People v. Stress* (1988) 205 Cal.App.3d 1259, 1270 ["A finding of deliberation and premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional *unless* those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action."], italics added.)

In light of our conclusion that a finding of first-degree murder is supported by the record but the judgment nevertheless must be reversed on account of prejudicial prosecutorial error, we need not address Hardin's other claims.

### *DISPOSITION*

The judgment is reversed.

_____

Smith, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Peña, J.